AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

District of South Carolina  [▼]

RECEIVED
USDC CLERK FLORENCE, SC
2022 JUN -1 PM 2:51

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| William James Dallis a/k/a Bill Dallis | )   Case No.   4:22MJ22 |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 2021 to present _____ in the county of _____ Horry _____ in the

_____ District of _____ South Carolina _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(a)(3) | Laundering of Monetary Instruments |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Joseph Hamski, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____ 06/01/2022 _____

_____
*Judge's signature*

City and state:  _____ Florence, South Carolina _____    Thomas E. Rogers, III, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Joseph Hamski, being duly sworn, depose and state:

1.     I am currently employed as a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for 14 years. During the course of my duties as an FBI agent, I have conducted numerous investigations involving money laundering, financial institution fraud, violent incident crime, and white collar crime. During these investigations, I have applied for arrest warrants and assisted in the application of search warrants.

2.     This statement of probable cause is in support of a complaint against William J. Dallis a/k/a Bill Dallis (hereinafter referred to as "Dallis") for violations of Title 18 U.S.C. § 1956(a)(3) (Laundering of Monetary Instruments).

3.     The facts set forth in this statement of probable cause are based on my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This statement is intended to show that there is probable cause for the violations set forth above and does not purport to set forth all of my knowledge or investigation into this matter.

## PROBABLE CAUSE

4.     On October 3, 2019, a confidential informant (CI) with the FBI (hereinafter referred to as "CI1"), advised that Dallis requested CI1's assistance with a $200,000 check cashing venture. Dallis asked CI1 to assist an individual named Doc Antle (hereinafter referred to as "Antle") by providing cash to him in exchange for a check greater than the value of the cash to be received. This is a hallmark of money laundering and other illicit financial activity, as the person writing the check actually loses money for the benefit of having liquid cash that cannot be traced. Dallis

USCA4 2

provided CI1 with Antle's phone number, identified as ▇▇▇▇▇▇ and told him/her to meet with Antle at 851 Folly Ranch Road, Myrtle Beach, South Carolina 29588.

5.    Dallis is a resident of Murrells Inlet, South Carolina. He is the owner and operator of S & D General Contractors. S & D General Contractors is a general contractor business located at 4733 Northgate Boulevard, Myrtle Beach, South Carolina, that specializes in designer build services, home construction, remodeling and roofing.

6.    Antle is a resident of Myrtle Beach, South Carolina. He is the owner and operator of The Institute for Greatly Endangered and Rare Species (T.I.G.E.R.S), also known as the Myrtle Beach Safari. The Myrtle Beach Safari is a 50-acre wildlife tropical preserve located at 851 Folly Ranch Lane, Myrtle Beach, South Carolina 29488. The Myrtle Beach Safari offers tours and private encounters with exotic wildlife.

7.    CI1 provided the known details from Dallis to an independent CI with Homeland Security Investigations (HSI) (hereinafter referred to as "CI2"). CI1 asked CI2 to meet Antle at the Myrtle Beach Safari.

8.    CI1 and CI2 were unaware of each other's identity as CI's for the federal law enforcement agencies listed above.

9.    On October 3, 2019, at the direction of Special Agents with the FBI and HSI, CI2 traveled to the Myrtle Beach Safari to meet with Antle. Antle texted CI2 from the phone number noted herein informing someone would meet him/her at the front entrance. A female, later identified to be Moksha Bybee, met with CI2 at the front gate. According to a news article online available via open source, Bybee is the general manager of the Myrtle Beach Safari. CI2 informed Bybee he/she could assist with the $200,000 transaction, but it would be a 6% charge and could take up to six days to receive the cash. Bybee informed she would relay the information to Antle.

2

USCA4 3

10.     On the same date, Dallis telephonically contacted CI1 using mobile phone number ████████████ Dallis said Antle wanted a one-time delivery of the funds, that the money can be counted at the Myrtle Beach Safari, and inquired if the fee can be reduced to 5%.

11.     Later that day, CI1 received a text message from Antle. The text message read the following: "We do not have enough time to wait. Thx for the offer of help. I had to do it today."

12.     On approximately March 11, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. In the recorded conversation, Dallis agreed to assist CI1 with money laundering. Dallis advised he is actively engaged in money laundering with others and detailed how to execute trade-based money laundering to CI1. The following is a transcription of two separate segments of the recorded conversation:

| | |
|---|---|
| CI1: | The other thing I wanted to ask you that's more like you know, maybe you know somebody that can help me out. I'm trying to move... I remember a long time ago that you asked me before about that guy from the zoo? |
| Dallis: | Doc. |
| CI1: | Yeah Doc, him. You asked me if I can find somebody to move him money and I am trying to do the same thing, do you know? |
| Dallis: | How much money you trying to move? |
| CI1: | 200 to 300, cause I remember you said he got somebody else from that. |
| Dallis: | Yeah, he did, let's shut that door… Alright, so you got about 300,000 that you're just trying. |
| CI1: | Yeah, maybe even more. |
| Dallis: | Talk to me, this is what I'm saying. I have people that do this. |
| CI1: | Yeah, you do? Yeah, that's what I want. I want to move at least couple hundred thousand. |
| Dallis: | And then have it come back to you? |
| CI1: | Yeah. |
| Dallis: | Okay, what rate are you willing to pay? |
| CI1: | I don't really know how much. |
| Dallis: | I don't know, I'd have to ask them. That is why I am asking you, what are you willing to pay then I'll approach them on that. |
| CI1: | Usually what they charge, 3%? 4%? |
| Dallis: | No, they're normally like 6 or 8. |

3

CI1:    Oh yeah?

Dallis:  Yeah, that's the only problem. But they deal with big numbers too. You know, one million, two million, three million. Umm if you're talking 2 or 300,000. I got to talk to them on this. I haven't had them do it under 8 to 6. They would go to 6 if there were normally a 2 to 3 million dollar.

CI1:    Yeah.

Dallis:  We actually have a guy, now this stays between us I mean, he's trying to move 125 million dollars.

CI1:    125 million?

Dallis:  To one of the reservations casinos

CI1:    Yeah.

Dallis:  I'm like, I have guys that can do it but I'm like…

CI1:    That's a lot.

Dallis:  Yeah, that's a lot. At six percent that's 7.5 million dollars. And I'm like, that scares me. Because the people I deal with, I'm actually a piece of it. Well, I get my fee of their fee. You know what I'm saying? But um, I know they are doing that. So that's what I mean. They're not afraid.

Dallis:  For instance, the way that we work with these guys, they bring us in a million dollars let's say, right, we turn around and they take $80,000. Well, the companies, the three players write back checks for $920,000 to their company. But it's not an expense, it's a pay. And so like the company writes out a million, they turn around and they wash it back, but they get this and show this (writing down) as they lost a million dollars. They roll it back into their company and they can legally take it from their company without any damages. You understand? Because the company is being paid for services rendered basically. But then you would still, dependent upon how your accountant files your taxes, you gotta make sure how he is filing it that you are not making that profit. It's for a job loss. So, you have to make sure your inventory or your labor shows that that expense is for reimbursement from a loan from you to your company. So it's just a loan reimbursement. So, what you are going to show is money going in as loan that you pulled back out. Make sense? That if you take it out as a loan, it's a repayment. They were just repaying you money you put into your business. And then it's legal. Now you don't have to pay income taxes on each, you only pay the 8% because your company received checks.

13.    On approximately June 3, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. In the recorded conversation, CI1 told Dallis he/she has cash in hand derivative of smuggling and harboring illegal aliens into the United States. Dallis agreed to assist

4

with laundering money for CI1 and discussed the percentage Dallis will retain for washing CI1's

cash, otherwise known as the money laundering fee or washing fee. The following is a transcription

of a segment of the recorded conversation:

| | |
|---|---|
| CI1: | So here's the deal, ah, after I spoke with you I stopped with the cashing in the bank you know. And so now I have, now I have more, and now I have about 300 thousand dollars cash that I want to do it like you say. Like you say I need to… |
| Dallis: | Okay. Keep the money in and then we write you checks back. |
| CI1: | Yes. |
| Dallis: | Umm, okay, and did you think about what you want to pay for that though? |
| CI1: | I want to pay as less as possible. |
| Dallis: | I know, but I got to call David, so that's why I'm saying, what do you think? |
| CI1: | [UI] what you say 8 okay more like 5 you know? |
| Dallis: | We'll go with 5, we'll offer it to him at 5 percent and see what he says. |
| CI1: | Okay. |
| Dallis: | Alright, I mean that's why I'm saying, I know what he normally but what you want because you weren't comfortable with that and so we'll go with 5 and see what he says. |
| CI1: | Yeah, see what he says cause I'm ready. And like I was saying in couple weeks I'll have more. Okay? |
| Dallis: | So right now were talking about 300 thousand. |
| CI1: | 300 thousand. |
| Dallis: | Okay, and then um how much you think you'll do on a regular basis. Like a half million a year? |
| CI1: | I'll make more, this thing I'm doing now which is no drugs and no guns, I'll make more. |
| Dallis: | Cash? |
| CI1: | Yeah. |
| Dallis: | Is it your restaurants or? |
| CI1: | No, no uhh what happen is I'm helping a lot of people come here now. |
| Dallis: | Gotcha, okay. |
| CI1: | They do labor. |
| Dallis: | Okay, they give you cash. |
| CI1: | They give me cash. |
| Dallis: | No, no I understand now. So there's no no so that's where the cash is, I was thinking I was trying to think how does he come up with the cash all the time. What builders are paying cash? |
| CI1: | Yeah I know, no one. |
| Dallis: | So you're talking about your other thing… |
| CI1: | So what happen is now I have this cash and I can't spend it. |

5

USCA4 6

> Dallis: But you can't do anything with it. Right, you can't because that's how you get into trouble.
> CI1: Yeah and with this pandemic now, a lot of people coming because there's no job anywhere and here there is no labor, we can't find people.
> Dallis: We can't find anyone, we need you guys.
> CI1: So I'm, I'm helping them and making money.
> Dallis: You're one of them Coyote's.
> CI1: Kind of.
> Dallis: Hey, fuck it yeah.

14.    From my knowledge as a law enforcement officer, I know and understand the term "coyote" to be a smuggler of immigrants into the United States in exchange for a fee.

15.    On approximately June 29, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. In the recorded conversation, Dallis and CI1 further discussed the money laundering operation and those with knowledge of it. The following is a transcription of two separate segments of the recorded conversation:

> CI1: [Talking about Dallis's wife] Does she know about what we do?
> Dallis: No, she knows about cash.
> CI1: Ohh I see, she knows how we do it.
> Dallis: You're one of… I do this with a couple other people and she's in on one of them. So I have accounts in Hong Kong. I have accounts that we can transfer for goods and services and I pull it back in as paid fees. So we have opened up these accounts and that's how I get it out. But that's why she says you can't do…woah woah woah, cuz I told her I'm moving about with you, you were saying three?
> CI1: Now I have three, next week I will have more.
> Dallis: [laughs] That's why we got to put because…
> CI1: No no, I'm ready man.
> Dallis: But it takes.. I can get you 30-40 thousand every week back at the 7% with no issues and we can do that all year long. It's when you need 300,000 next week, that gets me in trouble.
>
> Dallis: If I'm going to take risks, I'm going to get paid. My risk is nominal because I know you personally. But your other people you deal with, not yet, but say we do this for 3-4 months and it's rolling…
> CI1: Yeah.

6

USCA4 7

| Dallis: | What I need back from you then, they would have to give the money to you and you bring it to me. I don't ever want to meet anybody, I don't want to know anybody. I don't care that out of a million dollars we do, if 700 of it is for them and only 300, I don't care, you and I are the only two. I'm giving you a million dollars back that way. Make sense? |
| CI1: | mmm hmm. |
| Dallis: | Loose lips sink ships. You know that saying? Loose lips sink ships. The more people involved the more people talk. The more people talk, the more people get exposed. |

16. Due to Dallis' willingness to engage in money laundering in furtherance of violations of 8 U.S.C. § 1324, Bringing in and Harboring Certain Aliens – a qualified Specified Unlawful Activity (SUA) – as well as his sophisticated knowledge of how money laundering is executed, Special Agents of the FBI initiated a reverse money laundering operation in late June 2021. The reverse money laundering operation was as follows:

    a.    Special Agents of the FBI established a covert business name and bank account in the name of said business. This was a business entity by name only and offered no employees, storefront, goods and/or services.

    b.    Utilizing funds supplied by the FBI, an operation was established in which CI1 would provide cash to Dallis to launder monies for the said SUA.

    c.    In controlled operations that included consensual recordings and surveillances by Special Agents of the FBI, CI1 routinely met with Dallis and hand delivered cash to him.

    d.    Prior to and after each operation, Special Agents searched CI1 and his vehicle for cash in order to maintain the integrity of funds provided. In addition, Special Agents maintained a direct line of sight of CI1 while traveling to/from meetings with Dallis.

USCA4 8

e. On the same day and/or subsequent days following the provision of cash to Dallis, Dallis provided CI1 with a check(s) made payable to the previously established business, a business entity Dallis attributed to CI1. The remitter of the checks was listed as S & D SC Holdings LLC payroll account held at Wells Fargo Bank.

f. After receipt of the check(s) from Dallis, CI1 would then provide the checks to Special Agents of the FBI, who deposited the checks into a bank account in the name of the previously established business. The funds received in check form by Dallis were approximately 7% less than the monies provided, 7% being the negotiated washing fee between CI1 and Dallis.

g. Between late June 2021 to present, five separate cash transactions, more particularly described below, from CI1 to Dallis totaling $560,000 have been executed.

17. Special Agents of the FBI understand money laundering is the process by which a person or organization converts cash and/or assets gained through illicit activity into a form that can be used legitimately and openly. As such, it aims to conceal the origin of the criminal earnings, convert proceeds to a less a suspicious form and create a legitimate explanation for the source of assets. A washing fee is a term used to describe the fee that is retained by the individual converting or laundering the funds.

18. According to records provided by Wells Fargo Bank via grand jury subpoena, account number ███ 6318 and account number ███ 5300 in the name of S & D SC Holdings LLC includes Dallis as an account owner and signature authority.

USCA4 9

19.     On approximately June 30, 2021, at the direction of Special Agents of the FBI, CI1

utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D

General Contractors office. CI1 conducted a controlled delivery of $50,000 cash to Dallis as part

of the reverse money laundering operation. Dallis discussed how the money laundering operation

will work, detailing the use of a fake ledger and invoices. The following is a transcription of two

separate segments of the recorded conversation:

| | |
|---|---|
| Dallis: | We're not going to do anything electronically. No, no. We're going to have two ledger books. Here's how I am going to set the ledgers up. It's going to say … contracting options, market, etc. It's going to say how much the contract's for. How much did you bring right here? |
| CI1: | 50 |
| Dallis | 50. Now, I'm going to show, Bill owes [points at paper]… and this is the way you and I are each going have the exact same book. Each time we fill it out. You get one, I get one. Nobody knows what's going on. |
| CI1: | No |
| Dallis | [Dallis adds it up] That's 3500. So Bill owes 3500. That's 7%. Alright, so this is the way we are going to go right down the list. [looking at ledger] When it goes in, this is what comes out. It's 46,5. That's what you're getting. This is the way it will read. This will match my invoices in the company when I write the check. You understand? |
| CI1: | Ok |

| | |
|---|---|
| Dallis: | Now how do you want the checks written back? |
| CI1: | However you want. |
| Dallis: | To [redacted to protect CI1's identity]? To [redacted to protect CI1's identity]?? |
| CI1: | No, it's [redacted to protect CI1's identity]. |
| Dallis: | [Redacted to protect CI1's identity]?. Tomorrow, come by and I'll give you your first check, alright? |
| CI1: | Ok, I thought you were going to give it to me today, man. |
| Dallis: | Well I can give it to you today but I have to go get it processed. |
| CI1: | No no, I don't have to. |
| Dallis: | This way I am going to process you with my invoices. So every Friday you are going to go out with the other two hundred thousand dollars [referring to his entire payroll]. This is the way it's not obvious. It's just one of many checks being written. Every Friday you will pick up checks from me, like we always did. Ok? [redacted to protect CI1's identity]? |
| CI1: | Ok |

USCA4 10

20.     In the days following the meeting, Dallis provided a series of three checks to CI1 totaling $46,500 made payable to the previously established business. Dallis retained a 7% washing fee. Dallis wrote construction project sites on the memo line of the checks. No goods or services were provided by CI1 or CI1's companies/businesses to the related projects.

21.     On approximately June 30, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. In the recorded conversation, Dallis agreed to assist CI1 with laundering $100,000 and discussed a continual operation. The following is a transcription of two separate segments of the recorded conversation:

| | |
|---|---|
| CI1: | Hey, next time can I bring you like 100 instead of 50 all the time? |
| Dallis: | Yes. A hundred is no problem. Here is what my wife told me. I am running 3 accounts, ok. I can run up to $18,000 a day cash I can run through my 3 accounts…. |

| | |
|---|---|
| Dallis: | Your check is cut for you and you can pick it up first thing tomorrow morning. |
| CI1: | Ok, I'll be there at 9 o'clock. Thank so much. |
| Dallis: | No problem buddy, and you got that. Going forward we can do 100, whatever you want no problem. But just remember for every 50 I need 1 week. So if its 100, I'll give you 50 this week and 50 next. If it's 200, it will be 50, 50, 50, 50. You understand? |
| CI1: | Yeah |
| Dallis: | So we can keep rolling it through. And shit, we can literally do 2.5 million per year |

22.     On approximately July 7, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. CI1 conducted a controlled delivery of $100,000 cash to Dallis as part of the reverse money laundering operation. CI1 and Dallis discussed the status of the aliens in the smuggling operation. The following is a transcription of a segment of the recorded conversation:

USCA4 11

| CI1: | I have a lot of people coming in right now and they need work, do you have jobs for them? |
|------|---|
| Dallis: | We'll make work for them |
| CI1: | Yeah, I mean they're illegal but they're here for work. |
| Dallis: | Doesn't matter, we'll make work for them. Yeah, we'll make work. If we're teaming, those men will work for you like a demon. But if you bring them to me, they need to know that you and I are a partnership. |

23.     In the weeks following the meeting, Dallis provided a series of five checks to CI1 totaling $93,320 made payable to the previously established business. Dallis retained a 7% (approximate) washing fee. Dallis wrote construction project sites on the memo line of the checks. No goods or services were provided by CI1 or CI1's companies/businesses to the related projects.

24.     On approximately July 28, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. In the recorded conversation, Dallis confirms CI1 can provide an additional $100,000 cash to launder. CI1 asked Dallis if he wanted to invest in the smuggling operation to which Dallis expresses interest and agrees. The following is a transcription of a segment of the recorded conversation:

| CI1: | Are you going to be here Friday because I want to bring another 100? |
|------|---|
| Dallis: | That's fine. |
| CI1: | And you are going to keep doing this? |
| Dallis: | I'll just keep doing them. |
| CI1: | Cuz I got more. Hey, you know what, I got an idea cuz you offered me a couple things. You want to invest with me with what I'm doing? |
| Dallis: | What are you looking at, talk to me. |
| CI1: | You know, I'm bringing the illegal people in. |
| Dallis: | Ok |
| CI1: | That's how it works. I charge 18-20 thousand depends. So our plan is it costs me about 10 to 12 thousand to watch the port. Like with ticket from Brazil to Mexico, pay the Juarez hotel and all that, cross the border to get here to my, let's say my house, to our base it costs 10 to 12, 10 to 11. No more than that but we charge them 20. |
| Dallis: | Ok |
| CI1: | So most, some of them they have 20 thousand. But they don't give you or pay you until they get here. They want to make sure. |

11

| | |
|---|---|
| Dallis: | They make it. |
| CI1: | They don't want to give you all the money. The only risk we have is like let's say when they are crossing the border they got caught and they get deported. All we are losing is the ticket that we have to buy again, so probably a thousand bucks, not even that. So if they are willing to try again, until now nothing happens. None of them go back, some of them they only have let's say 10 grand. Just, I mean sometimes they have less, just sometimes. If you have at least 10, it covers it |
| Dallis: | You break even |
| CI: | Yeah, you break even. So when they get here… |
| Dallis: | Then they owe you 10 |
| CI: | Yeah, then they work for us and pay us 1500 dollars a month. |

25.     On approximately July 30, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. CI1 conducted a controlled delivery of $100,000 cash to Dallis as part of the reverse money laundering operation. Dallis and CI1 traveled together in Dallis's vehicle to 851 Folly Ranch Lane, Myrtle Beach, South Carolina 29488. The following is a transcription of two separate segments of the recorded conversation:

| | |
|---|---|
| CI1: | This month, this one, I've like got 60 something this week smuggling people in. |
| Dallis: | I told you I'm in. Tell me what you need from me. |
| CI: | Ok, I'll let you know. Like I said, I've got more people coming. |
| Dallis: | Yeah, well I'm with you and we will do it together. Like I said, whatever you... |
| | |
| CI1: | So, Doc wanted to do the 2 million cash with you and you didn't want to do it. That was to buy the monkeys? |
| Dallis: | Yeah, I couldn't do it. 2 million was too much for me |
| CI1: | And they won't come and check if those monkeys |
| Dallis: | What was that? |
| CI1: | Like if you buy those monkeys cash and? |
| Dallis: | Well he can't. The problem is he can't. He has to pay…He needed for me to launder two million dollars at one time. Like right now. I give you the 2 million, you give me it back. I can't do that. It would throw up every red flag in my book. |
| CI1: | Yeah |
| Dallis: | I can do what we're doing. 50 grand a week. I can hide that all fucking day long. I can't do a million dollars a week. |
| CI1: | Difficult. |

12

USCA4 13

> Dallis: But we can do 50, and we can do 50 and we can do 50. Every week. That's 2.5 million dollars. It takes two weeks to clear.

26.     In the weeks following the meeting, Dallis provided a series of five checks to CI1 totaling $92,600 made payable to the previously created business. In September 2021, it was discovered three of the five the checks provided by Dallis had bounced due to insufficient funds being available in the S and D SC Holdings, LLC account. The three checks that bounced were in the amounts of $16,230, $16,870 and $17,130.  When CI1 brought this to Dallis' attention, Dallis provided CI1 with three Wells Fargo Bank cashier's checks in the same amounts listed above. The cashier's checks were provided to CI1 on 11/2/2021. Dallis retained a 7% (approximate) washing fee. Dallis wrote construction project sites on the memo line of the checks. No goods or services were provided by CI1 or CI1's companies/businesses to the related projects.

27.     On approximately August 10, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. In the recorded conversation, Dallis discussed how Antle had previously requested Dallis's assistance with laundering money. The following is a transcription of a segment of the recorded conversation:

> CI1:     You trust him?
> Dallis:  Who? Doc?
> CI1:     Yeah
> Dallis:  100%. Why?
> CI1:     Oh. Cuz we can make deals.
> Dallis:  Big deals. No, bid deals. I mean, Doc. Millions and millions and millions.
> CI1:     Yeah, cuz you say sometimes he wants cash. Right? I can get him cash.
> Dallis:  He wanted me to move cash, but he wanted to move millions. And I was like, I can't do that.

28.     On approximately August 20, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S &

USCA4 14

D General Contractors office. In the recorded conversation, Dallis and CI1 reviewed the ledger

together and discussed how checks are being written in a manner that won't raise any suspicion.

The following is a transcription of a segment of the recorded conversation:

> Dallis: [CI1's true name] come look at this and I'll show you how I am doing this.
>
> CI1: Ok
>
> Dallis: [reviewing the ledger together] So…Alright up there I didn't have it before, that was our first one but on this one we are going down. 80 thousand, 87, 17, 1. I'm trying to make the numbers not the same. You know what I'm saying
>
> CI1: mm hmm.
>
> Dallis: But I'm listing the job that it's associated with which are all jobs that are running, that I can bury you in every fucking job, nobody can even question it cuz these are 7 million dollar, 3 million dollar jobs. I mean, you know what I am saying?
>
> CI1: mm hmm.

29. On approximately September 20, 2021, at the direction of Special Agents of the

FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at

the S & D General Contractors office. CI1 conducted a controlled delivery of $110,000 cash to

Dallis as part of the reverse money laundering operation. Dallis pulled the ledger out from his desk

drawer and updated the ledger in front of CI1. In the recorded conversation, Dallis advised how

he spent the cash he received from CI1. The following is a transcription of a segment of the

recorded conversation:

> CI1: Tell me, how do you put this in your accounts?
>
> Dallis: I don't use it for my accounts. I pay my subs.
>
> CI1: Ohh you pay cash to your subs.
>
> Dallis: Those that don't have insurances or licenses, I pay them cash.
>
> CI1: Ohhh.
>
> Dallis: So that's the only way I can do it, you know? That's why I am able to write you the check instead of me writing the check to that sub. I write you the check and I give them the cash.
>
> CI1: Ohh, so it balances out.

14

> Dallis: But I got to be, the only thing I have to do is make sure that the work I have going matches what I am paying out.

30. In the weeks following the meeting, Dallis provided a series of eight checks to CI1 totaling $102,000 made payable to the previously created business. Dallis retained a 7% (approximate) washing fee. Dallis wrote construction project sites on the memo line of the checks. No goods or services were provided by CI1 or CI1's companies/businesses to the related projects.

31. On approximately October 21, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. CI1 conducted a controlled delivery of $100,000 to Dallis as part of a reverse money laundering operation. In front of CI1, Dallis updated the ledger as well as the one belonging to CI1. Dallis put the black ledger into his desk drawer. The following is a transcription of a segment of the recorded conversation:

> CI1: Hey next uh… I'm getting ready to bring about 12 people.
> Dallis: Alright.
> CI1: You want to get in?
> Dallis: What do we need? Talk to me. How much?
> CI1: Between the each of us, between 50-60.
> Dallis: Ok, you need 60 thousand from me?
> CI1: Yeah, 50-60.
> Dallis: Ok, and what would that make us?
> CI1: That will make us about 25-30 grand.
> Dallis: Shit, 50%, hell yeah. Alright, when do you need it?
> CI1: I'll let you know
> Dallis: Ok, let me know. Yeah, I'm in on that. But that's, everything stays between you and me.
> CI1: Of course, yeah.
> Dallis: You know what I'm saying? I don't trust anybody anymore.

32. In the weeks following the meeting, Dallis provided a series of five checks to CI1 totaling $93,000 made payable to CI1's business. In January 2022, it was discovered one of the checks provided by Dallis had bounced due to insufficient funds being available in the S and D

USCA4 16

SC Holdings, LLC account. The check was in the amount of $14,750. When CI1 brought this to Dallis' attention, Dallis provided CI1 with one Wells Fargo Bank cashier's checks in the same amount listed above. The cashier's check provided to CI1 on 2/2/2022. Dallis retained a 7% washing fee. Dallis wrote construction project sites on the memo line of the checks. No goods or services were provided by CI1 or CI1's companies/businesses to the related projects.

33. On approximately November 24, 2021, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. In the recorded conversation, Dallis discussed generating fake invoices to match the log in the ledger and checks he is writing to the previously established business. The following is a transcription of two separate segments of the recorded conversation:

| | |
|---|---|
| Dallis: | One of the things I have to do based on our book. I am going to have to go back and generate you invoices for these jobs. Like Tiffany Shivuvit. |
| CI1: | Mm hmm. |
| Dallis: | Well, I didn't think she say going forward. She goes 'Bill, just bring the invoices' . So… |
| CI1: | For what? |
| Dallis: | We make up jobs. |
| CI1: | Oh ok. |
| Dallis: | What I'm saying is as long as I have an invoice instead of me just writing checks, she is asking questions... But when I bring her the invoice... Like right now, we are writing 150,000 dollars in invoices, right? So I can roll that through again. So I told her alright, we can do that. |
| | |
| Dallis: | But I got to generate invoices. So do you want to generate the invoice or would you rather me to do it? |
| CI1: | You do it. You do it. |
| Dallis: | Ok, I'm just gonna create a dummy invoice each time. So instead of just getting a copy of the check we will have a copy of an invoice to go with the check. but it's on all the jobs I'm running. It's beautiful. Legal on paper. |

34. On approximately January 25, 2022, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. Dallis retrieves the ledger, which is sitting on top of his desk, and

updates the ledger with payments made toward the money laundering. In addition, CI1 brought the ledger originally provided to him by Dallis, which Dallis updated as well. The following is a transcription of a segment of the recorded conversation:

> Dallis:  Alright.
> CI1:    I got my book too (CI1 provides his ledger to Dallis).
> Dallis:  Yeah, I'm showing….
> CI1:    And do you have the invoices?
> Dallis:  Yeah, I got all the invoices too, I'm making copies of them.

35.     On approximately April 18, 2022, at the direction of Special Agents of the FBI, CI1 utilized an audio/video recording device to record an in-person meeting with Dallis at the S & D General Contractors office. CI1 conducted a controlled delivery of $100,000 cash to Dallis as part of the reverse money laundering operation. When Dallis mentioned updating the ledger, he opened the drawer to his desk and retrieved a black 3 column notebook. Dallis opened the ledger and wrote in it. The following is a transcription of three segments of the recorded conversation:

> Dallis:  Alright, um, how much do you want to do this time? 100?
> CI1:    (head nod yes)
> Dallis:  Ok, I can get you the first check on Friday.
>
> Dallis:  I'll owe you 93 then, that's what we got to put in the ledger. Correct?
> CI1:    Mmm Hmm.
> Dallis:  And I'll do the receipts again.
> CI1:    Yep
>
> CI1:    When you gonna get in with me on this? I've got the people going through the tunnel.
> Dallis:  (looks at the door) We good?
> CI1:    Yeah, people going through the tunnel
> Dallis:  How much money do I need to get in?
> CI1:    Right now, like 30-40 grand. You can bring more money you can put more money in.
> Dallis:  But I mean, 40 grand to start?
> CI1:    Yeah
> Dallis:  Let me umm

USCA4 18

> CI1:     And they go to the tunnel. It's about an hour and 15 minutes, go into the
>           tunnel. Then they'll wait for somebody over…Somebody will be
>           waiting for them there. When they get there, they go to the hotel. As
>           long as they pay the Cartel.

36.     In the weeks following the meeting, and as of the date of this Affidavit, Dallis has

provided a series of five checks to CI1 made payable to the previously established business,

totaling $54,500. Dallis still owes the remaining $38,500 and is in the process of actively remitting

checks to CI1.

37.     From approximately June 30, 2021 to June 1, 2022, the reverse money laundering

scheme was operated by Special Agents of the FBI. The following is a breakdown of each

transaction in which cash was provided to Dallis and checks made payable to the previously

established business were provided to CI1 by Dallis:

**$50,000 cash payment to Dallis by CI1 on 6/30/2021**
$12,500 check received by CI1 on 7/01/2021
$19,300 check received by CI1 on 7/01/2021
$14,700 check received by CI1 on 7/01/2021
Total returned = $46,500
Dallis retained a 7% washing fee

**$100,000 cash payment to Dallis by CI1 on 7/07/2021**
$13,980 check received by CI1 on 7/09/2021
$15,020 check received by CI1 on 7/13/2021
$28,000 check received by CI1 on 7/22/2021
$19,200 check received by CI1 on 7/28/2021
$17,120 check received by CI1 on 7/28/2021
Total returned = $93,320
Dallis retained a 7% (approximate) washing fee

**$100,000 cash payment to Dallis by CI1 on 7/30/2021**
$16,870 check received by CI1 on 8/10/2021
$17,130 check received by CI1 on 8/10/2021
$15,650 check received by CI1 on 8/20/2021
$26,720 check received by CI1 on 8/20/2021
$16,230 check received by CI1 on 8/20/2021
Total returned = $92,600
Dallis retained a 7% (approximate) washing fee

**$110,000 cash payment to Dallis by CI1 on 9/20/2021**
$9,800 check received by CI1 on 9/27/2021
$16,500 check received by CI1 on 9/27/2021
$14,200 check received by CI1 on 9/27/2021
$13,500 check received by CI1 on 9/27/2021
$13,800 check received by CI1 on 10/21/2021
$15,200 check received by CI1 on 10/21/2021
$11,650 check received by CI1 on 10/21/2021
$7,350 check received by CI1 on 10/21/2021
Total returned = $102,000
Dallis retained a 7% (approximate) washing fee

**$100,000 cash payment to Dallis by CI1 on 10/21/2021**
$32,000 check received by CI1 on 11/24/2021
$21,000 check received by CI1 on 12/14/2021
$13,000 check received by CI1 on 12/21/2021
$12,250 check received by CI1 on 1/14/2022
$14,750 check received by CI1 on 1/25/2022
Total returned = $93,000
Dallis retained a 7% washing fee

**$100,000 cash payment to Dallis by CI1 on 4/18/2022**
$12,500 check received by CI1 on 4/22/2022
$12,650 check received by CI1 on 5/3/2022
$11,250 check received on 5/12/2022
$9,200 check received on 5/24/2022
$8,900 check received on 5/24/2022
Total returned * as of the date of this Affidavit* = $54,500 (Dallis still owes the remaining $38,500 and is in the process of actively remitting checks to CI1)

38.     The total amount of money laundered by Dallis as of the date of this Affidavit is $560,000. The total amount of money provided by Dallis as of May 27, 2022, is $481,920.


### CONCLUSION

39.     Based on the foregoing, I submit that there is probable cause to believe that from June 30, 2021, to the date of this Affidavit, the Defendant, William J. Dallis a/k/a Bill Dallis, within the District of South Carolina, committed violations of Title 18 U.S.C. § 1956(a)(3) (Laundering of Monetary Instruments).

19

40.     This affidavit has been reviewed by Assistant United States Attorneys Derek A. Shoemake and Amy Bower.

Respectfully submitted,

_____
Joseph Hamski
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on June _____, 2022


_____
The Honorable Thomas E. Rogers, III
United States Magistrate Judge

AO 442 (Rev. 01/09) Arrest Warrant



# UNITED STATES DISTRICT COURT

RECEIVED
USDC CLERK, FLORENCE, SC

2022 JUN -I PM 2: 51

for the

District of South Carolina

United States of America
v.
William James Dallis a/k/a Bill Dallis )
)
)
)
)

_____
*Defendant*

Case No. 4:22 mj 22

# ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    William James Dallis a/k/a Bill Dallis                                    ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment      ☐ Superseding Indictment      ☐ Information      ☐ Superseding Information      ☑ Complaint
☐ Probation Violation Petition      ☐ Supervised Release Violation Petition      ☐ Violation Notice      ☐ Order of the Court

This offense is briefly described as follows:
Title 18 U.S.C. § 1956(a)(3) - Laundering of Monetary Instruments

Date:  06/01/2022
_____                          _____
                                                                          *Issuing officer's signature*

City and state:   Florence, SC                                    Thomas E. Rogers, III, U.S. Magistrate Judge
_____                          *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                                    _____<br>*Arresting officer's signature*<br><br>_____<br>*Printed name and title* |